# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CARL DALE HOTT,** | : | CIVIL ACTION NO. 2:17-CV-97 |
| | : | |
| **Plaintiff** | : | (Chief Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| **AUTO SYSTEM CENTERS, INC.,** | : | |
| trading and doing business as Midas | : | |
| **Auto Service Experts,** | : | |
| | : | |
| **Defendant** | : | |

## **MEMORANDUM**

Plaintiff Carl Dale Hott ("Hott") commenced this action against his former employer, defendant Auto System Centers, Inc. ("Auto System"), alleging that Auto System terminated him for participating in jury service in violation of 42 PA. CONS. STAT. § 4563. Hott also brings a claim for wrongful discharge. Auto System moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 38).

I.    **Factual Background & Procedural History**[1]

Auto System provides automobile repair and maintenance services. (See Doc. 45-3 at 2). Hott interviewed for a district manager position with Chris Harter ("Harter"), Auto System's regional manager. (Doc. 40 ¶ 2). Harter instead offered Hott a store manager position, which Hott declined. (Id. ¶¶ 2-3). Several months later, Hott expressed renewed interest in the offered position and Harter set up an interview for Hott with an Auto System district manager, Trent Kight ("Kight"). (Id. ¶¶ 4-5). In September 2015, Kight hired Hott as store manager for Auto System's Allison Park, Pennsylvania location. (Id. ¶¶ 1, 5; Doc. 44 ¶¶ 1; Hott Dep. 68:8-20 ("Hott Dep.")).[2]

---

[1] Local Rule 56 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported by a "separately filed concise statement setting forth the facts essential for the Court to decide the motion for summary judgment, which the moving party contends are undisputed and material." LOCAL RULE OF COURT 56(B)(1). A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues for trial. See LOCAL RULE OF COURT 56(C)(1)(a)-(b). The opposing party may also "set[] forth in separately numbered paragraphs any other material facts that are allegedly at issue." LOCAL RULE OF COURT 56(C)(1)(c). Unless otherwise noted, the factual background herein derives from the parties' Local Rule 56 statements of material facts. (See Docs. 40, 44). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, we cite directly to the statements of material facts. Although Hott's separately filed statement of facts (Doc. 43) does not technically comply with Local Rule of Court 56(C)(1)(c), we have considered and scrutinized this supplemental information and Auto System's response (Doc. 49) thereto, as well as the entire record to determine the uncontroverted facts of this matter.

[2] The parties have each filed portions of plaintiff's deposition at separate docket entries. Unless otherwise noted, the court will cite to this deposition *passim* as "Hott Dep." without a docket entry citation. The court employs this citation convention for deposition transcripts throughout this memorandum.

2

As regional manager, Harter was responsible for eight district managers and 48 stores across New York, Pennsylvania, and Ohio; he lived and maintained an office in Ohio. (Doc. 40 ¶¶ 17-19, 21). Harter rotated among the 48 stores and visited the Allison Park location every few months. (Id. ¶¶ 22-23). As district manager, Kight oversaw daily operation of seven stores in Pittsburgh. (Id. ¶ 13). His responsibilities included human resources, facilities and equipment maintenance, and sales. (Id. ¶ 14). Hott reported directly to Kight who, in turn, reported to Harter. (Id. ¶¶ 12, 17).

Auto System evaluates store managers based on "key performance indicators." (See Kight Dep. 53:14-16, 55:8-13 ("Kight Dep.")). The universe of key performance indicators encompasses sales, payroll metrics, cost of goods, store image, employee turnover, each store's "stat sheet," Auto System's "secret shopper" program, phone recordings of customer interactions, credit card applications, online reviews, and a customer service index. (See Harter Dep. 42:2-45:18 ("Harter Dep."); Kight Dep. 53:14-55:7). In December 2015, Kight circulated "The 2016 Midas VI" goals to each of the seven stores in his district. (Doc. 45-2 at 37; see also Kight Dep. 50:22-51:13). The 2016 Midas VI set daily, weekly, and monthly goals for store managers in six areas: credit card applications, online reviews, tires, alignments, spins, and gross profits. (Doc. 45-2 at 38; see also Kight Dep. 50:22-51:13). Despite some overlap, the Midas VI goals were a distinct set of benchmarks from Auto System's key performance indicators. (Harter Dep. 45:19-21; see Kight Dep. 53:14-20).

3

The offer letter to Hott detailed the responsibilities of an Auto System store manager. (Doc. 40 ¶¶ 6-10). In particular, Hott was responsible for the Allison Park store seven days a week and was required to work when store staff was shorthanded. (Id. ¶¶ 7-8). In addition, Hott was an at-will employee, and Auto System reserved the right to require him to work up to six days a week based on staffing and sales needs. (Id. ¶¶ 6, 9). He was accountable for sales growth, profitability, the store's image, and generally upholding company standards and procedures. (Id. ¶¶ 9-10; see also Kight Dep. 44:11-17). Kight and Hott spoke by phone at least once a week, and Kight was physically present at the Allison Park store approximately one full day every other week. (Doc. 40 ¶ 16).

The Allison Park location had once been successful, and Harter hoped that with Hott as store manager, it would "perform again." (Id. ¶ 26; Harter Dep. 75:8-11). During his tenure at this location, Hott received some negative feedback on his performance. (Doc. 40 ¶ 31). Kight told Hott that his performance was "flat" and that he needed to increase sales. (Id. ¶ 30; Hott Dep. 92:1-8, 96:17-20). Harter testified that after visits to the store, he lost hope that it would improve and stated that he "never saw a sparkle in [Hott]." (Harter Dep. 93:10-94:1). Harter struggled to recall the nature and frequency of his visits to Allison Park and what factors led to his conclusion that Hott had not improved store operations, beyond purported average sales performance. (Id. at 93:10-95:11).

When the Allison Park store did not improve as anticipated, Harter informed Kight that he wanted Hott to be terminated for poor performance. (Kight Dep. 108:21-109:9; see Doc. 40 ¶¶ 27, 30; Doc. 44 ¶¶ 27, 30). Ostensibly against Harter's

4

wishes, Kight offered to transfer Hott to the Penn Hills, Pennsylvania location. (Hott Dep. 92:20-93:2). Hott requested time to think about the transfer offer because the Penn Hills location was one of the poorest performing stores in Kight's district. (Doc. 40 ¶¶ 32-33). He ultimately agreed to take the position. (Id. ¶ 34).

Hott was transferred to the Penn Hills location in July 2016 and worked there through mid-October 2016. (Hott Dep. 96:4-7). Harter stated that he hoped Hott would "grow his skills" managing the Penn Hills store. (Doc. 40 ¶ 28; Harter Dep. 75:14-15). Hott testified that Kight asked him to move to the Penn Hills location after Kight had "two very bad customer service issues" with previous store managers. (Hott Dep. 87:25-89:1). According to Hott, Kight never indicated that Hott's transfer was based on dissatisfaction with his job performance at Allison Park. (Id. at 89:2-5).

### A. Jury Summons

On Friday, October 7, 2016, Hott received a jury duty summons directing him to report for jury service on Tuesday, October 11, 2016. (Doc. 40 ¶ 39). When Hott informed Kight of his jury summons, Kight responded "okay. That's fine. Just switch your day off." (Id. ¶¶ 41-42). Hott expressed concern that jury duty may be more than one day and explained that he could not take his day off on October 11 because of a preexisting veterinary appointment. (Id. ¶ 43). Kight responded "[w]ell, you'll have to figure something out, then." (Id. ¶ 44). Hott had previously taken individual days off work with no negative impact on his employment; on one such occasion, Kight covered the Penn Hills store for Hott. (Id. ¶¶ 57-58).

Hott asked his assistant manager, Jeff Kendall ("Kendall"), to cover the store on October 11 in his absence. (Id. ¶¶ 11, 46). Kendall was purportedly unable to switch days because he had a longstanding commitment at an outpatient clinic on Tuesday mornings. (See id. ¶ 47; Doc. 44 ¶ 47; Hott Dep. 49:2-5). Kendall claims he told Hott that he could cover the store on October 11. (Kendall Dep. 15:16-16:9 ("Kendall Dep.")). Hott sent Kight a text message on Saturday, October 8, 2016 stating Kendall was unable to cover the store and that, as an exempt employee, he believed Auto System had to pay him for any days spent on jury duty. (Doc. 40 ¶ 49). Hott texted Kight: "Either way as soon as they interview me I'll get out of it bc I'm not trying to do that shit but I thought u said u have Harter next week so jus tryin to cover bases." (Id.) Hott did not want to serve on a jury. (Id. ¶ 40).

On Sunday, October 9, Kendall called Hott and stated that he could cover Hott's shift on Tuesday by moving his day off. (Id. ¶ 51). Hott texted Kight Sunday afternoon to let him know that Kendall was covering the store on Tuesday; Kight received the text and acknowledged it when he was at the store on Monday. (Id. ¶¶ 52-53). Hott was not selected as a member of a jury and returned to work on Wednesday, October 12. (Id. ¶ 54). When Hott asked Kight whether he needed to provide paperwork to get paid for jury duty, Kight responded "no." (Id. ¶ 59). Hott believed he would be paid for the day of jury service based on Kight's response. (Id. ¶ 60).

**B.    Penn Hills Store Visit**

Harter conducted store visits in Kight's district beginning on Monday, October 10, 2016. (Kight Dep. 89:2-90:21; see Doc. 40 ¶¶ 49, 62). Harter visited the

6

Penn Hills store on October 12 for the second time during Hott's tenure as store manager at that location. (Doc. 40 ¶ 61; see id. ¶ 24).

During his visit, Harter became visibly upset at the state of the Penn Hills store. (Id. ¶ 63). Oil was seeping out of several oil bins and covered an area of five feet or more. (Id. ¶ 64; Kendall Dep. 22:10-22). The parties dispute the size of the spill and exactly how long the oil spill had been left unaddressed. (Doc. 40 ¶¶ 64-65; Doc. 44 ¶¶ 64-65). Harter testified that Oil-Dri, a cat litter-like substance, had been placed on the spill and that rags were left lying around the floor. (Harter Dep. 83:15-84:19). Kendall stated that no effort had been made to contain or clean the spill until Harter and Kight arrived at the store, but he did not recall seeing the spill the previous day, when he covered Hott's shift. (Kendall Dep. 23:4-11, 24:23-25:11). Harter, Kight, and Kendall spent over four hours cleaning up the oil spill. (Doc. 40 ¶¶ 67, 69, 75). Hott assisted with cleanup but also covered the front desk and office and received customers throughout the day. (Harter Dep. 87:10-16; Kendall Dep. 23:24-24:12; Hott Dep. 106:6-23). Kight and Harter were dissatisfied with Hott's contributions to the cleanup effort and felt Hott showed no concern about the oil spill. (See Harter Dep. 184:22-24; Kight Dep. 97:16-98:23). Harter viewed Hott's failure to address the spill earlier as a lack of leadership and evidence of neglect. (Doc. 40 ¶¶ 73-74).

Harter identified an issue with the store's oil pumps. (Id. ¶ 71). The oil pumps were on top of the 55-gallon oil barrels rather than inside them. (Id. ¶ 71; Harter Dep. 85:8-13; 87:2-3). Hott explained that he and his team had been unable to get the oil pumps to work properly, at which point Harter showed the group how

7

to prime and operate the pumps. (Hott Dep. 105:12-16; Doc. 40 ¶ 72). Harter testified that poorly maintained bushes, unaddressed weeds, and debris in the dumpster area also contributed to the store's negative appearance. (Harter Dep. 82:2-14; see also Kight Dep. 107:13-14). Approximately one week earlier, Kight had conducted an "in-shop evaluation" of the Penn Hills store which graded both weed and trash cleanup, and lawn and beds maintenance, as "good." (Doc. 45-3 at 6). Auto System's October 2016 newsletter noted that the Penn Hills "office always looks great and the lawn is always well maintained." (Id. at 4).

### C. Hott's Termination

On the evening of October 12, 2016, Harter told Kight to terminate Hott's employment. (Doc. 40 ¶ 86). Harter testified that with each visit to the Penn Hills store, he "lost more and more faith in [Hott's] performance and abilities." (Id. ¶ 29; Harter Dep. 75:14-18). He cited Hott's lack of leadership and commitment, his handling of the oil spill, the store's appearance, and his unprofessional "image" as reasons for the termination. (Harter Dep. 95:13-96:1, 180:10-181:1). Harter clarified that the Penn Hills store sales, the key performance indicators, and the Midas VI goals played no role in his decision. (Id. at 96:4-12, 106:22-108:5). Neither Hott nor Kendall ever told Harter about Hott's jury service. (Doc. 40 ¶¶ 92, 96-97). Harter contends that he was not aware that Hott missed work on October 11 for jury duty when he directed Kight to fire Hott. (Harter Dep. 66:16-68:10). He also claims that it was solely his decision to terminate Hott's employment. (Id. at 92:11-23).

On October 17, 2016, Kight terminated Hott and informed him that he was being let go for "poor performance." (Doc. 40 ¶¶ 88-89). Kight testified that Harter

8

made the decision to terminate Hott but that Kight was responsible for completing the employee separation notice. (Kight Dep. 105:2-6, 123:4-12; Harter Dep. 106:12-21). Kight documented what he perceived to be Harter's motivations based on their conversations about Hott. (Kight Dep. 105:21-106:5). The notice states that Hott was terminated for poor performance and "failure to achieve minimum [key performance indicator] goals." (Doc. 45-2 at 28-29). Kight cited to Hott's lack of commitment, his failure to maintain the internal and external appearance of the store, and improperly dressed store technicians as evidence of his poor performance. (Kight Dep. 101:5-9, 101:23-102:11). He further elaborated that Harter considered Hott's failure to achieve the minimum weekly sales threshold at the Penn Hills store for two consecutive weeks as another reason for his termination, but acknowledged that Harter never mentioned key performance indicators as a reason for terminating Hott. (Id. at 102:16-22, 107:9-12, 107:19-21; Harter Dep. 107:25-108:5). Harter clarified that he provided Kight with no instruction as to how to fill out Hott's termination notice and claimed he was unaware that Hott had failed to meet target sales goals when he decided to terminate Hott. (Harter Dep. 106:22-107:24, 147:1-9).

On October 18, 2016, Kight notified Auto System's payroll department that Hott should receive his normal weekly salary for his final week of work because his absence on October 11 was for jury duty. (Doc. 40 ¶ 103; Doc. 44 ¶ 103). Contemporaneous with Hott's termination, Auto System experienced technical difficulties with its payroll system causing employees companywide not to receive their paychecks. (Doc. 40 ¶¶ 105-06). Hott received a direct deposit in error which

9

Auto System reversed, causing a negative account balance. (Id. ¶¶ 107-08). Auto System's payroll department assured Hott that it would deposit the proper amounts "[o]nce the reverse cleared." (Id. ¶¶ 108-09). Hott contacted Harter to express his frustration with the length of time Auto System took to rectify the payroll issues and deposit error. (Id. ¶ 110). At that time, Hott did not raise the issue of jury duty compensation with Harter. (Id. ¶ 111). At some point following his termination and the payroll issues, Hott realized that Auto System failed to pay him for his day of jury service. (Hott Dep. 70:1-16). Following Hott's deposition in July 2017, Auto System paid Hott for his day of jury service. (Doc. 40 ¶ 104; Doc. 45-2 at 27).

### D. Procedural History

Hott commenced this action in the Court of Common Pleas of Allegheny County, Pennsylvania. Hott asserts one claim of a violation of Pennsylvania's juror protection statute and one claim for wrongful discharge in violation of Pennsylvania public policy. Auto System timely removed the case to federal court. Auto System now moves for summary judgment on both claims. The motion is fully briefed and ripe for disposition.

## II. Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett,

477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

## III. Discussion

Hott alleges that Auto System wrongfully discharged him on account of his jury service in violation of 42 PA. CONS. STAT. § 4563 and Pennsylvania public policy. Auto System moves for summary judgment on both claims, arguing that Hott presents no evidence of animus toward his one day of jury service. Auto System further avers that Hott's wrongful discharge claim is duplicative of the claim for violation of Pennsylvania's juror protection statute and therefore not cognizable.

### A. Jury Service

In the Commonwealth of Pennsylvania, an employer may not deprive an employee of his or her job, position of seniority, or benefits "because the employee receives a summons, responds thereto, serves as a juror or attends court for prospective jury service." 42 PA. CONS. STAT. § 4563(a). The statutory civil remedy for adverse employment action related to jury service is set forth as follows: "the employee may bring a civil action for recovery of wages and benefits lost as a result

of the violation and for an order requiring the reinstatement of the employee." Id. § 4563(c).

Prior to the enactment of 42 PA. CONS. STAT. § 4563, Pennsylvania courts recognized a cause of action under the public policy exception to Pennsylvania's at-will employment doctrine for a person who was terminated for performing jury service. Reuther v. Fowler & Williams, Inc., 386 A.2d 119, 120-21 (Pa. Super. Ct. 1978) (citing Geary v. U. S. Steel Corp., 319 A.2d 174, 180 (Pa. 1974)). No Pennsylvania court has articulated an exact standard for establishing whether jury service was the reason for adverse employment action either under the common law or under 42 PA. CONS. STAT. § 4563(a) and (c). The four federal courts to substantively address the statute have employed a traditional causation analysis. See Burns v. Salem Tube, Inc., No. 02:08-0289, 2009 WL 2448000, at *10–11 (W.D. Pa. Aug. 7, 2009), aff'd, 381 F. App'x 178, 183 (3d Cir. 2010); Marquess v. City of Philadelphia, No. 98-1117, 1998 WL 355519, at *3-4 (E.D. Pa. June 29, 1998); Goodson v. Cigna Ins. Co., No. 85-0476, 1988 WL 52086, at *12-14 (E.D. Pa. May 20, 1988), reconsideration denied, 1988 WL 111962 (E.D. Pa. Oct. 19, 1988).

We also predict that the Pennsylvania Supreme Court would employ a traditional causation analysis, requiring a plaintiff to establish that his or her jury service was a substantial factor in an employer's decision to take adverse employment action against the employee. In the context of other public policy exceptions to the at-will employment doctrine, the Pennsylvania Supreme Court instructs that the activity implicating public policy must be a "substantial factor" in an employer's decision to terminate or adversely affect the conditions of

12

employment.  See, e.g., Rothrock v. Rothrock Motor Sales, Inc., 883 A.2d 511, 517 (Pa. 2005).  The *Pennsylvania Suggested Standard Civil Jury Instructions* have adopted this standard for Section 4563, stating that a plaintiff establishes a violation thereof if the jury service was a "factual cause" for the adverse employment action. PA. SUGGESTED STANDARD CIVIL JURY INSTRUCTIONS § 21.70 (2009) (citing Rothrock, 883 A.2d at 517).  We see no reason why different standards of review would apply in the statutory and common law contexts.[3]  Nevertheless, an employer "may discharge an employee if [it] has a separate, plausible, and legitimate reason for doing so," even when an important public policy is implicated.  Reuther, 386 A.2d at 122 (citing Geary, 319 A.2d at 180).

Auto System correctly notes the absence of direct evidence of animus towards his jury service on the part of Auto System or its employees.  Harter and Kight never discouraged Hott from participating in jury duty or threatened him with negative employment repercussions for participating therein.  Kight's comments simply do not evince hostility toward jury service, especially given that, as store manager, Hott was responsible for scheduling store coverage and working

---

[3] Hott suggests that the court adopt the familiar burden shifting test set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973), which some courts have applied to the analogous federal jury protection statute. (Doc. 42 at 4).  He identifies one case in support of the sweeping proposition that federal district courts interpreting Section 4563 apply the same standards used in cases brought pursuant to the federal jury protection act. (Doc. 42 at 4 (citing Goodson, 1988 WL 52086)).  Goodson does not support Hott's position.  Goodson brought claims pursuant to both the Pennsylvania and federal jury protection statutes in a single count.  Goodson, 1988 WL 52086, at *12.  The court focused on the federal statute in conducting its factual analysis, but it neither analogized the two statutes, nor did it apply the McDonnell Douglas framework to either.  Id. at *12-14.

13

when the staff was shorthanded. (See Doc. 40 ¶¶ 7-8, 41-42, 44). The only person to explicitly disparage jury service was Hott, who did not want to serve on a jury. (See id. ¶¶ 40, 49).

We find, however, that Hott has narrowly adduced sufficient circumstantial evidence to allow a reasonable jury to conclude that Auto System terminated Hott because of his jury service. Harter directed Kight to terminate Hott the day after he returned from jury service. (Doc. 40 ¶¶ 54, 86). Kight effected Hott's termination within one week of his jury service. (Id. ¶¶ 54, 88-89). Hott claims Auto System "refus[ed] to pay [him] for the jury duty day he missed." (Doc. 42 at 22). He did not receive compensation for his one day of jury service, despite Kight's instruction to the payroll department, until after his deposition nearly nine months later. (See Doc. 40 ¶¶ 103-04; Doc. 44 ¶ 103; Doc. 45-2 at 27). Auto System points to companywide payroll issues around the time of Hott's termination, as well as Hott's failure to notify anyone of the mistake, as reasons for its failure to timely compensate him for jury service. (See Doc. 40 ¶¶ 105-11).

Genuine questions also remain as to Harter and Kight's proffered explanations for Hott's termination. Harter and Kight testified that Hott was transferred to Penn Hills because of his lackluster performance as store manager in Allison Park. (Doc. 40 ¶¶ 30-31; Hott Dep. 92:1-8, 96:17-20; Harter Dep. 93:10-94:1). But Harter could not recall what factors informed this opinion or how often he visited Allison Park when Hott worked there. (Harter Dep. 93:10-95:11). Hott maintains that he was transferred to Penn Hills after two previous store managers

14

failed, not because he underperformed at the Allison Park store. (Hott Dep. 87:25-89:5).

Following his visit to the Penn Hills store, Harter pointed to Hott's purported lack of leadership and commitment, his handling of an oil spill, and the store's appearance as reasons for terminating Hott. (Harter Dep. 95:13-96:1, 180:10-181:1). Harter and Kight's testimony conflict as to whether Penn Hills weekly average sales factored into the termination decision. (Compare Harter Dep. 96:4-12, 147:1-9 with Kight Dep. 102:16-22, 107:9-12). Harter claims that he did not consider Hott's success or failure appertaining Auto System's key performance indicators or the 2016 Midas VI goals, but Kight cited "failure to achieve minimum [key performance indicator] goals" as a reason for firing Hott on the employment termination notice. (Harter Dep. 96:4-12, 106:22-108:5; Doc. 45-2 at 28-29). And Harter's testimony regarding the negative exterior appearance of the Penn Hills store on October 11 is contradicted by Kight's in-shop evaluation the week before and the company's October 2016 newsletter which extolled the well-maintained Penn Hills store. (Compare Harter Dep. 82:2-14 and Kight Dep. 107:13-14 with Doc. 45-3 at 4, 6).

Auto System argues that Harter exercised sole decisionmaking authority and had no knowledge of Hott's jury service at the time he directed Kight to terminate Hott. (Doc. 48 at 6-11). According to Kight, Harter wanted Hott terminated for poor performance at the Allison Park location, yet Kight instead transferred Hott to the Penn Hills store. (Kight Dep. 108:21-109:9; Hott Dep. 92:20-93:2; see Doc. 40 ¶¶ 32-34). Harter, who is based in Ohio, travelled to Pittsburgh to visit stores with Kight the week of Hott's jury duty. (Doc. 40 ¶¶ 13, 18, 21, 49, 62; Kight Dep. 89:2-90:21).

Kight was aware of Hott's jury summons. (Doc. 40 ¶ 41). Although admittedly a close call, we find that a reasonable jury could infer that Harter learned of Hott's absence on October 11 for jury service when planning his store visits in Kight's district. On at least one prior occasion, Kight covered the Penn Hills store in Hott's absence. (Doc. 40 ¶ 58). A jury could plausibly conclude that any absence for jury duty would inconvenience Harter as well as Kight, who as district manager would have been responsible for covering the Penn Hills store during Harter's visit to his district if Hott failed to find coverage.

Taken together, the close proximity of Hott's jury service and termination, discrepancies in Harter and Kight's proffered justifications for firing Hott, and Auto System's failure to timely pay him for jury service militate against summary judgment. Moreover, credibility questions remain as to who exercised decisionmaking authority in firing Hott, whether all decisionmakers knew of Hott's jury service at the relevant times, and to what extent Hott's absence may have inconvenienced Harter and Kight. Based on this Rule 56 record, a reasonable jury could conclude that Hott's jury service was a substantial factor in Auto System's decision to terminate him.

### B. Wrongful Discharge

Under Pennsylvania law, when the legislature provides a statutory remedy, that remedy is exclusive and preempts common law remedies. 1 PA. CONS. STAT. § 1504; see also Burns, 2009 WL 2448000, at *11, aff'd on other grounds, 381 F. App'x 178 (3d Cir. 2010) (citing Galbraith v. Philips Info. Sys., Inc., No. 83-6118, 1984 WL 49166, at *2 (E.D. Pa. Feb. 14, 1984); Panea v. Isdaner, 773 A.2d 782, 789 (Pa. Super.

Ct. 2001), aff'd sub nom. Bell v. Slezak, 812 A.2d 566 (Pa 2002)). Section 4563 protects an employee from adverse employment actions on account of his or her jury service and creates a cause of action and remedy against employers that violate this provision. 42 PA. CONS. STAT. § 4563(a), (c). Because Hott is pursuing his sole statutory remedy, he cannot maintain a common law cause of action for wrongful discharge.[4]

## IV. Conclusion

The court will grant in part and deny in part Auto System's motion (Doc. 38) for summary judgment. An appropriate order shall issue.

                                                     Christopher C. Conner, Chief Judge
                                                     United States District Court
                                                     Middle District of Pennsylvania

Dated:     September 28, 2018

---

[4] Hott directs the court to the Philadelphia County Court of Common Pleas' decision in Sheeran v. Kubert, Himmelstein & Associates. P.C., 69 Pa. D. & C. 4th 303 (Pa Ct. Com. Pl. 2003), wherein the court held that the statutory provisions of Section 4563 did not provide "the exclusive remedy to an employee terminated for serving on jury duty." Id. at 320. The Sheeran decision failed to engage with the directives of 1 PA. CONS. STAT. § 1504. Moreover, the court's opinion focuses on the rights of employees who fall within Section 4563's exception for employers "in any retail or service industry employing fewer than 15 persons or any employer in any manufacturing industry employing fewer than 40 persons." 42 PA. CONS. STAT. § 4563(d). This provision has no bearing on the dispute *sub judice*. For these reasons, we find Sheeran to be unpersuasive and inapplicable to the instant case.